916 P.2d 1156

Christina Crossman ADAMS and
Catherine Crossman Hall,
Plaintiffs/Appellants,

v.

The STATE of Arizona; Arturo Rojas,
Defendants/Appellees.

No. 2 CA–CV 95–0208.

Court of Appeals of Arizona,
Division 2, Department A.

Dec. 26, 1995.

Review Denied May 21, 1996.

Harris & Palumbo, P.C. by John D. Harris and Shawn Cunningham, Phoenix, for Plaintiffs/Appellants.

Steptoe & Johnson by Bruce E. Meyerson and Kathryn E. Underwood, Phoenix, for Plaintiffs/Appellants.

Mitten, Goodwin & Raup by Sharon E. Ravenscroft, Donald F. Froeb and Calvin L. Raup, Phoenix, for Defendants/Appellees.

*OPINION*

PELANDER, Judge.

Plaintiffs/appellants, two sisters, were sexually abused by Owen Crossman after they were placed with and later adopted by him and his wife Frances. The trial court granted summary judgment against the sisters, concluding that the state and its Department of Economic Security (DES) caseworkers (appellees) were absolutely immune from liability for alleged negligence in investigating the Crossmans' fitness as prospective adoptive parents and in monitoring the suitability of the sisters' placement in the Crossmans' home. We reverse and remand for further proceedings.

*FACTS AND PROCEDURAL HISTORY*

In May 1979, following a dependency proceeding, appellants and their two older brothers (the children) were declared wards of the state and committed to DES's care, custody and control. The children were placed in foster homes. In March 1980, the Crossmans applied for adoption certification with DES.[1] Before filing a petition for adoption, they were required to be certified by

1. The Crossmans were never foster parents nor licensed for foster care.

2. Statutory references to Title 8, 2A A.R.S., in this decision are to the statutes as they exist now.

the juvenile court as being acceptable to adopt. A.R.S. § 8–105(A).[2]

A certificate is issued only after an investigation is conducted by DES, an officer of the court or another agency. § 8–105(C), (E), (H) and (K). DES caseworker Jacqueline LaPointe was assigned to investigate the Crossmans, § 8–105(C), and to then submit an adoption home study to the juvenile court with her recommendation on certification. § 8–105(H). Under § 8–105(E), "[t]his investigation and report to the court shall consider all relevant and material facts dealing with the prospective adoptive parents' fitness to adopt children, and shall include ... [a] complete social history ... [t]he moral fitness of the applicant ... [and the] mental health condition of the applicants."

In addition to the statutory requirements, DES promulgated extensive regulations on caseworkers' roles in investigating prospective adoptive parents and children and in supervising placement prior to final approval of the adoption petition. A.R.S. § 41–1954(A)(3); Ariz.Admin.Code R6–5–6501–R6–5–6610; D.E.S.Regs. 5–65–05–5–66–10. Judge Kimball Rose, while serving as Presiding Juvenile Court Judge for the Maricopa County Superior Court, also developed written guidelines (the guidelines) for adoption caseworkers "to utilize in submitting adoption reports for court approval" and "to aid the judicial process of certifying prospective adoptive parents and children placed for adoption."

Within ninety days after the application is filed, DES must present a written report of its investigation of the prospective adoptive parents to the juvenile court. § 8–105(H). LaPointe submitted her home study report to the court in May 1980, recommending the Crossmans for certification. Finding the report satisfactory, in June 1980 the juvenile court certified the Crossmans as acceptable to adopt the children.

DES placed the children in the Crossmans' home in April 1981, in anticipation of their

There have been no material, substantive changes to the statutes since 1980–81, the time frame relevant to this case.

442

adoption and pending the outcome of termination proceedings against their natural parents. Within ninety days after that placement, DES was required to investigate, *inter alia*, "the suitability of the child's placement with the applicant," § 8–105(F)(6), and to present to the juvenile court a written report including "a definite recommendation for or against certifying the child[ren] as being suitable or not suitable for adoption by the prospective adoptive parent[s]." § 8–105(I). In accordance with those statutory requirements, another DES caseworker, appellee Arturo Rojas, was assigned to investigate and report to the court and to supervise the children's placement, monitor their progress and visit them during the first year. The DES regulations required Rojas, as the social services worker for the children, and LaPointe, as the social services worker for the family, to work together to ensure an appropriate fit between adoptive parents and children. D.E.S.Regs. 5–65–13(I), 5–65. Rojas submitted his report to the juvenile court, recommending that the Crossmans be permitted to adopt the children.

In June 1981, the juvenile court approved the Crossmans' continued custody of the children pending formal adoption. It also terminated the parental rights of the children's biological parents. In July 1981, the court extended the Crossmans' certification for a year, after reviewing and accepting another follow-up home study LaPointe conducted in June 1981.

After the juvenile court certifies adoptive parents, they may file a petition to adopt. § 8–109. Once a petition is filed, the court must direct DES to undertake a social study and submit a written report. § 8–112(A). The court may accept the certification report made under § 8–105 in lieu of a social study. *Id.* The hearing shall be held no sooner than six months after the petition is filed. § 8–113(C). During that six-month probationary period, the child is subject to further investigation by the person or agency required to do so by § 8–105. *Id.*

In October 1981, the Crossmans filed a formal adoption petition, which the court granted in April 1982 after a hearing. On April 17, 1985, appellants (then ages 11 and 12) reported to the Phoenix police that Owen Crossman had begun fondling them shortly after they were placed in the home in April 1981 and that he had subjected them to oral, anal and vaginal intercourse approximately three times per week since 1983. DES immediately filed a dependency petition, and the children were made temporary wards of the court on April 30, 1985. Appellants remained wards of the court until one turned 18 in 1990 and the other married in 1991. In 1992, the Crossmans pled guilty to criminal charges for the sexual abuse of appellants. Owen Crossman is currently incarcerated, and his wife is on probation.

Appellants sued the state and Rojas, alleging that they were negligent in investigating the Crossmans' fitness to be adoptive parents and in monitoring the children's placement in the Crossmans' home before the adoption became final. Appellants claimed, *inter alia*, that appellees had failed to comply with certain DES regulations and the juvenile court's guidelines. Had appellees adhered to the regulations and guidelines and conducted a reasonable investigation, appellants contend, they probably would have learned that Owen Crossman had been sexually abused as a child, had previously sexually abused his adult stepdaughter (whom DES had not contacted despite having her name and address) during her teenage years and had sexually abused appellants soon after they were placed in the Crossman home. According to appellants, appellees would also have learned that the children had been emotionally and physically abused by their natural father.

Appellees moved for summary judgment based on absolute judicial immunity, relying in part on an affidavit from Judge Rose which stated that he "directed all adoption caseworkers to use the Guidelines"; that strict compliance with the guidelines "was mandatory and was an integral part of the judicial process of certifying adoptive parents and adoptive children"; and that, in "preparing their reports ... Jacqueline LaPointe and Arthur Rojas reported in accordance with the Guidelines promulgated by [him]." In granting the motion, the trial court stated:

This Court can find no distinction between the facts in this case as to [appel-

lees] including DES and the case of *Lavit vs. Superior Court,* 173 Ariz. 96 [839 P.2d 1141] (App.1992) on the issue of whether judicial immunity applies to [appellees'] duties as performed in this case.

The Court finds that that decision was further affirmed by the Court of Appeals decision in Maricopa County Juvenile Action No. JD–6236, 164 Ariz.Adv.Rep. 65 (App.1994), since the doctrine of judicial immunity applies as to [appellees] in this cause.

This appeal followed.

## STANDARD OF REVIEW

On appeal from a summary judgment, we must determine *de novo* whether there are any genuine issues of material fact and whether the trial court erred in applying the law. *United Bank v. Allyn,* 167 Ariz. 191, 805 P.2d 1012 (App.1990). We view the evidence in a light most favorable to the party against whom summary judgment was entered, and all favorable inferences fairly arising from the evidence must be given to that party. *Angus Medical Co. v. Digital Equip. Corp.,* 173 Ariz. 159, 840 P.2d 1024 (App.1992). Questions of law are reviewed *de novo,* and "[w]hether judicial immunity exists is a question of law for the court." *Lavit v. Superior Court,* 173 Ariz. 96, 99, 839 P.2d 1141, 1144 (App.1992).

## DISCUSSION

The nature and scope of judicial immunity raise perplexing and somewhat amorphous issues, which are not susceptible to easy resolution in some cases. This is such a case. Although the Arizona decisions shed some light on these issues, they do not compel any particular conclusion here.[3] We note at the outset, however, "that where negligence is the proximate cause of injury, the rule is liability and immunity is the exception." *Stone v. Arizona Highway Comm'n,* 93 Ariz. 384, 392, 381 P.2d 107, 112 (1963). *See also*

*Ryan v. State,* 134 Ariz. 308, 311, 656 P.2d 597, 600 (1982).

In *Grimm v. Arizona Bd. of Pardons and Paroles,* 115 Ariz. 260, 564 P.2d 1227 (1977), our supreme court concluded that parole board members were entitled to qualified but not absolute immunity in connection with their decisions to release prisoners on parole. Reciting a list of "policy reasons traditionally advanced for absolute judicial immunity," *id.* at 264, 564 P.2d at 1231, the court noted that "the policy reasons for [administrative] official immunity are much weaker than for judicial immunity." *Id.* at 265, 564 P.2d at 1232. It held that "absolute immunity for public officials in their discretionary functions acting in other than true judicial proceedings is not required and, indeed, is improper." *Id.*

The supreme court again considered immunity issues in *Acevedo v. Pima County Adult Probation Dep't,* 142 Ariz. 319, 690 P.2d 38 (1984), in which the plaintiffs alleged that probation officers had negligently supervised a probationer who had molested the plaintiffs' children. The court noted that "immunity is granted to those who perform functions 'intimately related to,' . . . or which amount to 'an integral part of the judicial process.'" *Id.* at 321, 690 P.2d at 40, *quoting Ashbrook v. Hoffman,* 617 F.2d 474, 476 (7th Cir.1980), and *Robichaud v. Ronan,* 351 F.2d 533, 536 (9th Cir.1965). Although the court concluded that "[t]hose officers, employees, and agents who assist the court in the judicial process are . . . entitled to absolute immunity," 142 Ariz. at 322, 690 P.2d at 41, it also noted that immunity is applicable to officers serving the judiciary only when the underlying policy of "principled and fearless decision-making" is served. *Id.* at 321, 690 P.2d at 40.

In evaluating cases from Arizona and other jurisdictions, the court in *Acevedo* noted that "[t]he consistent reasoning in these cases is that each non-judicial officer performed a function, pursuant to a court directive, which was related to the judicial process." *Id.*

---

3. In 1984, the legislature enacted A.R.S. § 12–820.01(A)(1), which grants absolute governmental immunity for any public employees' acts and omissions constituting "[t]he exercise of a judicial or legislative function." The provisions of that statute, which confirm the law as it existed

before the statute was enacted, apply retroactively. *See* 1984 Ariz.Sess.Laws, ch. 285, § 1. Although the statute applies to this case because Arizona courts recognized judicial immunity before the statute was enacted in 1984, it does not resolve the issue posed here.

Although the court ruled that probation officers are entitled to absolute immunity for preparing and submitting presentence reports because such reports are "an integral part of the sentencing process," *id.* at 322, 690 P.2d at 41, it held that the officers in that case were not entitled to immunity because they had acted contrary to the court's directive. ("Any possible claim to immunity ceased when the officers ignored the specific direction of the court.") *Id.*

In *Nation v. Colla,* 173 Ariz. 245, 841 P.2d 1370 (App.1991), parents sued a Child Protective Services (CPS) caseworker under 42 U.S.C. § 1983 for alleged wrongful removal of a child from their custody and his subsequent death. Relying on federal case law, Division One of this court held that the caseworker was absolutely immune for initiating the filing of a dependency petition, obtaining a temporary custody order over the child, and for any conduct after the petition was filed. *Id.* at 247, 841 P.2d at 1372. The court also held that she was entitled to qualified immunity for her actions before the dependency petition was filed. *Id.* at 252, 841 P.2d at 1377.

In *Lavit,* a case relied on by the trial court here, the husband sued a psychologist who had examined the parties to a marriage dissolution and had submitted child custody recommendations to the court. The husband claimed that the psychologist's custody evaluations were biased because he had a previous, undisclosed association with the attorney representing the wife. Although the parties had stipulated to the psychologist's appointment and the trial court had adopted the stipulation as its own order, Division One of this court stated that the inquiry is "not how the psychologist was first chosen but whether his activity is an integral part of the judicial process so that to deny immunity would disserve the broader public interest that non-judicial officers act without fear of liability." *Id.* at 99, 839 P.2d at 1144. Over a strong dissent, the court held that the psychologist was, in effect, court-appointed and was entitled to absolute immunity for his

role in the child custody determination because his evaluations and recommendations had aided the trial court and his services were performed pursuant to court order. *Id.* at 101, 839 P.2d at 1146.

Based on the Arizona cases, as well as decisions from other jurisdictions, we extract several factors pertinent to determining whether to grant or deny absolute immunity. Such factors and their application to this case are summarized as follows.

### 1. *Court–Ordered Conduct*

■ A public employee's acting pursuant to court order is one basis for granting absolute immunity. *See Acevedo,* 142 Ariz. at 321–22, 690 P.2d at 40–41 (probation officer entitled to immunity only if "acting pursuant to or in aid of the directions of the court"); *Lavit,* 173 Ariz. at 101, 839 P.2d at 1146; *Yamamoto v. Santa Cruz County Bd. of Supervisors,* 124 Ariz. 538, 540, 606 P.2d 28, 30 (App.1979) (court clerk's return of cash appeal bond to the wrong party pursuant to court order was protected by judicial immunity). *See also Wooldridge v. Virginia,* 453 F.Supp. 1333 (E.D.Va.1978). Appellants concede that "nonjudicial personnel are entitled to immunity when carrying out court directives."

Although, in a broad sense, LaPointe and Rojas acted under the auspices of the juvenile court and were subject to its general supervision and guidelines, their duties and functions primarily were based on statutory and regulatory requirements. *See* A.R.S. § 8–105(C), (I). There is no evidence that they acted pursuant to any specific court order in conducting their investigations or in supervising the children post-placement. Similarly, Judge Rose's direction to all caseworkers to use the guidelines in preparing reports to the court does not constitute an order concerning the caseworkers' investigations. The guidelines describe what information should appear in reports submitted to the court, but do not specify how caseworkers should conduct their investigations.[4]

---

4. Moreover, those guidelines applied to adoption proceedings in Maricopa County only. As such, they cannot form the basis for granting blanket absolute immunity to DES caseworkers throughout the state.

In addition, although §§ 8–105(L) and 8–112 authorized the court to order additional investigation or an additional social study as it deemed necessary, there is no indication that it did so here. There also is no evidence that the court ordered DES to conduct a social study under § 8–112, but rather, the court apparently accepted in lieu thereof the certification report made under § 8–105. Moreover, DES's initial placement of the children in the Crossman home in April 1981 was before any court approval or supervision, and Owen Crossman's molestation of appellants began almost immediately thereafter. Finally, unlike the psychologist in *Lavit*, LaPointe and Rojas were not court-appointed to conduct the certification or post-placement investigations and supervision.[5] Under these circumstances, LaPointe's and Rojas's investigative and supervisory functions cannot clearly be characterized as court-ordered so as to justify absolute immunity on that ground.

### 2. *Functioning as an Integral Part of the Judicial Process*

Courts have found that certain activities essential to the functioning of the judicial system warrant absolute protection from suit. Examples include submitting presentence reports, *Acevedo;* submitting child-custody evaluations and recommendations, *Lavit;* initiating the filing of child dependency petitions, *Nation* and *Meyers v. Contra Costa County Dep't of Social Services,* 812 F.2d 1154 (9th Cir.1987), *cert. denied,* 484 U.S. 829, 108 S.Ct. 98, 98 L.Ed.2d 59 (1987); submitting adoption recommendations, *Wooldridge;* and making reports and recommendations to the court as a guardian ad litem, *Barr v. Day,* 124 Wash.2d 318, 879 P.2d 912 (1994). *Acevedo* and *Lavit,* however, did not address the type of investigative functions at

issue in this case. Appellants challenge only the investigative and supervisory aspects of appellees' duties, not the submission of investigative and home study reports or certification and adoption recommendations to the juvenile court.[6] While the latter functions probably would be shielded by absolute immunity, appellees have cited no authority for granting such immunity for the former functions.

Although not raised as a defense and not a basis of the trial court's ruling, prosecutorial immunity nonetheless is analogous to judicial immunity. In that regard, a number of courts have refused to extend claims of absolute prosecutorial immunity to investigative actions. *See, e.g., Buckley v. Fitzsimmons,* 509 U.S. 259, 271–72, 113 S.Ct. 2606, 2615, 125 L.Ed.2d 209, 227 (1993) (denying absolute immunity to prosecutors who allegedly fabricated evidence); *Achterhof v. Selvaggio,* 886 F.2d 826, 830–31 (6th Cir.1989) (denying absolute immunity to social worker investigating child abuse); *Hodorowski v. Ray,* 844 F.2d 1210, 1216 (5th Cir.1988) (denying absolute immunity to child protective service workers investigating child abuse); *Babcock v. Washington,* 116 Wash.2d 596, 610, 809 P.2d 143, 151 (1991) (denying absolute immunity to case workers investigating foster care placement). Absolute prosecutorial immunity also has been rejected for claims of negligent supervision and resulting injury of a child in foster care. *Scott v. County of Los Angeles,* 27 Cal.App.4th 125, 143–44, 32 Cal. Rptr.2d 643, 652 (1994).

■ Under the foregoing cases, which we find persuasive, investigative and supervisory conduct undertaken outside a judicial context is not absolutely immune. The same principle applies to claims of judicial immunity,

---

5. *Acevedo* involved probation officers who had a close employment relationship with the court. The presiding judge of each county's superior court appoints the chief adult probation officer, who then *appoints deputy officers with the approval of the presiding judge.* A.R.S. § 12–251(A). The deputy officers hold office "under rules and procedures established by the supreme court." *Id.* In contrast, DES caseworkers are not appointed or approved by the court, but are executive branch employees under the control of the state administrative agency.

6. Appellants concede that the caseworkers' recommendations and reports to the juvenile court are protected by absolute immunity, acknowledging that "[j]ust as judges need to be free from liability in making judicial determinations, caseworkers need the same protection to promote candid, frank and unbiased advocacy on their part."

which typically attaches only to judicial acts and ends when its purpose is served. *Forrester v. White*, 484 U.S. 219, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988) (absolute immunity did not protect a state court judge's demotion and dismissal of a court employee because the judge's actions were administrative, not judicial).

■ Although the DES caseworkers undoubtedly worked closely with the juvenile court, we cannot say that their routine and statutorily-required investigative and supervisory functions were conducted as an integral part of the judicial process. Appellees' position seems to be that because the juvenile court has exclusive jurisdiction over matters affecting children (Ariz. Const. art. VI, § 15; A.R.S. §§ 8–105–116, –202, –532; *In re Maricopa County Juvenile Action No. JD–6236*, 178 Ariz. 449, 874 P.2d 1006 (App. 1994)), and because DES caseworkers work closely with the court and are expected to comply with its guidelines as well as the statutory and regulatory requirements, these nonjudicial employees are absolutely immune from liability for all adoption-related acts or omissions. We are unable to accept such a broad proposition.

### 3. *Policy Considerations*
#### A. Accountability.

■ In *Grimm*, our supreme court refused to extend absolute immunity to parole board members because there were few remedies for wrong decisions and because there was no check on the board's "unbridled discretion." 115 Ariz. at 265–66, 564 P.2d at 1232–33. *See also Meyers*, 812 F.2d at 1158 (denying absolute immunity to a caseworker who ordered a father to stay away from his home prior to his hearing because the caseworker "was not subject to the checks operating on judicial decisionmakers, nor was his decision part of or ancillary to pending judicial proceedings supervised by a judge").

Appellees contend that, unlike the situations presented in *Grimm* and *Meyers*, the juvenile court's review of investigative and home study reports submitted by caseworkers and its ability to require additional investigation are sufficient to hold caseworkers accountable for their actions. Theoretically that may be true, but we cannot say it was true in this case or is true in most cases. In *Babcock*, 116 Wash.2d at 608, 809 P.2d at 149, the Washington supreme court denied absolute immunity to caseworkers performing foster care placement investigations partially because the caseworkers controlled the information upon which the court relied when evaluating placements. As in *Babcock*, the DES caseworkers here essentially controlled the information supplied to the juvenile court, as revealed by their investigations, and the court relied upon that information in making its certification and adoption decisions. We cannot say there are sufficient accountability safeguards inherent to or routinely used in this process to warrant the granting of absolute immunity in this context.

#### B. Deterring Acceptance/Performance of Duties.

The court in *Lavit* noted that "[e]xposure to liability [of professional experts] could deter their acceptance of court appointments or color their recommendations." 173 Ariz. at 99, 839 P.2d at 1144. In contrast, DES caseworkers are not appointed by the court and have no power to either accept or reject their statutorily-mandated role in adoption-related matters. Moreover, disallowing absolute immunity for their investigative and supervisory acts should not "color their recommendations," particularly since appellants concede that the reports and recommendations themselves are shielded by absolute immunity.

■ In addition, this case is different from cases like *Nation* involving CPS social workers' investigation and reporting of allegations of child abuse or neglect and their instigation of related court proceedings. Even in that context, there are "a myriad of conflicting decisions among federal and state courts" on immunity determinations in actions brought under 42 U.S.C. § 1983. *See* Eric P. Gifford, Comment, *42 U.S.C. § 1983 and Social Worker Immunity: A Cause of Action Denied*, 26 Tex.Tech.L.Rev. 1013 (1995). The tension in that setting between the need for social workers to protect children from harm

on the one hand and to avoid overstepping their bounds by violating the constitutional rights of parents accused of child abuse on the other is clear. Absolute immunity is often necessary to ensure that social workers act quickly to protect children without fear of retribution from parents. There is no such tension here. Prospective adoptive parents have no absolute right to adopt a child nor any right to be free from a thorough investigation and screening before their adoption certification and petition are approved and the adoption is finalized.

### C. Fearless Decision–Making.

The most important policy objective in granting absolute judicial immunity is to prevent undue influence from the threat of lawsuits and liability that could discourage fearless, independent action by public employees. *Grimm*, 115 Ariz. at 264, 564 P.2d at 1231. Indeed, as the court in *Acevedo* noted, "[t]he primary reason for judicial immunity from civil actions is to assure that judges will exercise their functions with independence and without fear of consequences"; thus, immunity is applicable to officers serving the judiciary only when the underlying policy of "principled and fearless decision-making" is served. *Acevedo*, 142 Ariz. at 321, 690 P.2d at 40.

Without question, fearless decision making is critical to DES caseworkers submitting reports and making certification and adoption recommendations to the courts. We certainly want caseworkers to decide what is best for adoptive children without worrying about lawsuits from disgruntled adoptive parents. The same concern does not hold, however, for caseworkers' investigation of the adoptive parents and child or for supervision of the adoptive family post-placement. Such activities do not require the same type of decision making. Indeed, the fear of potential liability should not deter DES caseworkers from freely and independently performing their jobs, but it arguably could motivate them to conduct thorough investigations and to closely supervise adoptive families. In turn, diligent investigation and supervision should improve the reports and recommendations caseworkers submit to the

courts, ultimately benefitting adoptive children. It is, of course, the children's best interests that are paramount considerations in this context.

### RESOLUTION

Determining the nature and extent of judicial immunity in a particular factual setting ultimately is reduced to a policy decision, a balancing of competing interests. Judicial immunity is a creature of common law, *Acevedo*, 142 Ariz. at 321, 690 P.2d at 40, and the courts are responsible for shaping and monitoring the course of the common law. *See Estate of Hernandez v. Arizona Bd. of Regents*, 177 Ariz. 244, 253–54, 866 P.2d 1330, 1340–41 (1994); *Ontiveros v. Borak*, 136 Ariz. 500, 504, 667 P.2d 200, 204 (1983). Considering the aforementioned factors and policy rationales bearing on judicial immunity determinations, and applying the functional analysis espoused in *Acevedo* and *Lavit*, we see little reason for granting absolute immunity for the type of investigative and supervisory conduct at issue here. In our view, the benefits of granting absolute immunity to appellees in this context are outweighed by the risks, most notably subjecting children to the potentially devastating and life-long damages of an ill-advised adoptive relationship.

By this decision, we of course express no view on the merits or ultimate resolution of appellants' claims. In addition, we need not and do not decide whether appellees are shielded by qualified immunity and if so, the nature and extent of any such immunity, because those issues were neither raised nor briefed in this appeal. We only hold that appellees are not absolutely immune from liability for the type of pre-adoption investigative and supervisory negligence alleged here. The trial court's judgment is reversed, and the case is remanded for further proceedings consistent with this decision.

LIVERMORE, P.J., and FERNANDEZ, J., concur.