IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

GABRIEL GARIBAY; DEBORAH MARTINEZ-GARIBAY; AND PIMA COUNTY,
*Petitioners,*

*v.*

HON. KELLIE JOHNSON, JUDGE OF THE SUPERIOR COURT OF THE STATE OF
ARIZONA, IN AND FOR THE COUNTY OF PIMA,
*Respondent,*

*and*

WILLIAM FOX, THE SURVIVING SPOUSE OF ANGELA FOX, DECEASED,
INDIVIDUALLY AND ON BEHALF OF ALL THOSE ENTITLED BY LAW TO
RECOVER FOR THE DEATH OF ANGELA FOX,
*Real Party in Interest,*

No. CV-24-0091-PR
Filed March 13, 2025

Appeal from the Superior Court in Pima County
The Honorable Kellie L. Johnson, Judge
No. C20231936
**REVERSED AND REMANDED**

Opinion of the Court of Appeals, Division Two
257 Ariz. 118 (App. 2024)
**VACATED IN PART**

COUNSEL:

Andrew J. Petersen (argued), Humphrey & Petersen, P.C., Tucson,
Attorneys for Gabriel Garibay, Deborah Martinez-Garibay, and Pima
County

David L. Abney, Ahwatukee Legal Office, P.C., Phoenix; Robert Grabb, Grabb & Durando, PC, Tucson; John J. Kastner, Jr. (argued), Marco B. Mercaldo, Carlo D. Mercaldo, Mercaldo Law Firm, Tucson; and Thomas A. Zlaket, Thomas A. Zlaket, P.L.L.C., Tucson, Attorneys for William Fox

———————————————

VICE CHIEF JUSTICE LOPEZ authored the Opinion of the Court, in which JUSTICES BOLICK, BEENE, MONTGOMERY, KING, and JUDGE PETERSON* joined. CHIEF JUSTICE TIMMER concurred in the result.

———————————————

VICE CHIEF JUSTICE LOPEZ, Opinion of the Court:

**¶1**        We consider whether the common law doctrine of judicial immunity shields constables from liability under A.R.S. § 11-449 for "any misconduct in the service or execution" of a writ of restitution.

**¶2**        We hold that § 11-449 limits rather than abrogates judicial immunity. Thus, a constable who engages in "any misconduct" in the service or execution of a writ is subject to liability. "Misconduct" is an intentional violation of an applicable rule, standard, or norm. Within the meaning of the statute, "misconduct" involves a constable's willful or intentional failure to follow a court directive, law, or rule—here, execution of a writ of restitution. Thus, "misconduct" arises from a constable's failure to carry out a particular court directive, law, or rule, rather than mere negligence or gross negligence in the manner of its execution.

## BACKGROUND

**¶3**        On August 25, 2022, Constable Deborah Martinez-Garibay ("Garibay")—less than six months into her tenure as a constable—attempted to serve a writ of restitution issued by a justice court on a tenant in an apartment complex in Tucson. The tenant was being

---

* Due to the retirement of Justice Robert Brutinel, pursuant to article 6, section 3 of the Arizona Constitution, Judge Michael D. Peterson, Presiding Judge of the Graham County Superior Court, was designated to sit in this matter.

evicted for threatening a resident with a gun and disturbing the peace. Garibay enlisted the apartment manager, Angela Fox ("Angela"), to accompany her while she served the writ. At the tenant's apartment door, Garibay knocked for several minutes, identified herself as a constable, announced her intent to serve the writ, and warned the tenant she would call the police if he did not open the door. The tenant fatally shot Garibay, Angela, and a visitor in an adjoining apartment before taking his own life.

¶4        Angela's surviving spouse, William Fox ("Fox"), filed a wrongful death action against Garibay's surviving spouse, as well as Pima County and the Arizona Constable Ethics, Standards and Training Board ("CESTB").[1] As relevant here, Fox's suit against Garibay's spouse alleged that Garibay was negligent and grossly negligent in failing "to protect and avoid exposing [Angela] . . . and the general public to harm" while serving the writ of restitution. Fox also alleged that Garibay "had cocaine, alcohol and other illicit substances in her system" while executing the writ.[2]

¶5        Garibay's spouse moved for judgment on the pleadings, arguing that Garibay, as a constable, enjoyed judicial immunity and owed no duty to Angela because constables are officers of the court. The superior court denied the motion.

¶6        Garibay's spouse filed a special action petition in the court of appeals, contending that Garibay, as a constable, was entitled to judicial immunity and owed no duty to Angela. The court accepted special action jurisdiction. In an opinion, the court held that Garibay was judicially immune from liability because, even if her actions were alleged to be negligent or grossly negligent, they did not constitute "misconduct" under § 11-449. *Garibay v. Johnson*, 257 Ariz. 118, 127 ¶ 26 (App. 2024). The court therefore reversed the superior court's denial of judicial immunity but did not consider whether Garibay owed a duty of care to Angela. *Id.* ¶¶ 27–28.

---

[1] Fox's suit against Pima County and CESTB alleging vicarious liability under respondeat superior and negligent hiring, training, and supervision is not before us.

[2] The toxicology report on Garibay was positive for five substances above the reporting limit, including an Ethanol level of 19 mg / dL, a Blood Alcohol Concentration of 0.019 g / 100 mL, an Amphetamine level of 34 ng / mL, a Benzoylecgonine level of 210 ng / mL, and a Cocaine level of 50 ng / mL.

¶7 We granted review because whether the common law doctrine of judicial immunity shields constables from liability under § 11-449 is an issue of first impression, statewide importance, and likely to recur. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution.

## DISCUSSION

¶8 To determine whether Garibay is subject to liability under § 11-449 for "any misconduct in the service or execution" of the writ of restitution, we must answer the following questions: (1) does common law judicial immunity apply to a constable; (2) if so, does § 11-449 abrogate or limit common law judicial immunity; and (3) if judicial immunity does not shield Garibay from § 11-449's application, did Fox's complaint allege that Garibay committed "misconduct" within the statute's meaning?

¶9 A party is entitled to judgment on the pleadings when a "complaint fails to state a claim for relief." *Giles v. Hill Lewis Marce*, 195 Ariz. 358, 359 ¶ 2 (App. 1999). When we review a motion for judgment on the pleadings, we accept the complaint's factual allegations as true, but review the trial court's legal conclusions de novo. *Shaw v. CTVT Motors, Inc.*, 232 Ariz. 30, 31 ¶ 8 (App. 2013), *as amended* (Mar. 29, 2013). We review issues of statutory construction de novo. *Planned Parenthood Ariz., Inc. v. Mayes*, 257 Ariz. 137, 142 ¶ 13 (2024).

## I.

¶10 We begin our analysis with the threshold question of whether Garibay, as a constable, is subject to common law judicial immunity. The court of appeals held that constables enjoy judicial immunity, reasoning that when constables execute writs they engage in a judicial function "closely tied to the judicial decision to issue the writ in the first place." *Garibay*, 257 Ariz. at 125 ¶ 15. We agree.

¶11 Constables are borne of a legislative act and their duties are codified in statute. *See* A.R.S. § 22-131. As relevant here, § 22-131(A) requires constables to attend courts and execute, serve, and return all processes, warrants, and notices as directed by a justice of the peace or

4

competent authority. *Clark v. Campbell*, 219 Ariz. 66, 71 ¶ 18 (App. 2008). Moreover, courts may exercise control over constables and discipline them for non-performance of their judicial duties. *Id.* at 72 ¶ 21.

¶12            The common law doctrine of judicial immunity exists to ensure judges perform their work with independence and without fear of consequences. *Burk v. State*, 215 Ariz. 6, 9 ¶ 7 (App. 2007). But our courts have recognized that, to advance the independence and efficacy of the judiciary, judicial immunity should extend to court officers and others who perform functions intimately related to the judicial process. *See id.* ¶ 8.

¶13            Our courts have extended absolute judicial immunity to an array of court officers, employees, and agents who "assist the court in the judicial process." *Acevedo v. Pima Cnty. Adult Prob. Dep't*, 142 Ariz. 319, 322 (1984); *see also Burk*, 215 Ariz. at 9 ¶ 8 (recognizing application of judicial immunity to "guardians ad litem, court-appointed psychologists, and probation officers"); *Yamamoto v. Santa Cruz Cnty. Bd. of Supervisors*, 124 Ariz. 538, 540 (App. 1979) (extending absolute immunity to a court clerk following a court's order).

¶14            We have emphasized that, although many employees work with and within the judicial system, judicial immunity only applies where these duties are essential to the judicial process. For example, in *Acevedo*, parents sued the Pima County Adult Probation Department for negligent supervision of a probationer who, despite a probation condition prohibiting contact with minors, was permitted to reside with young children and injured them. 142 Ariz. at 320. We recognized that probation officers are entitled to "absolute protection from suit for actions which are necessary" in preparing and submitting presentence reports to the court and enforcing court-imposed conditions of probation. *Id.* at 322. However, we clarified that not "all the activities of a probation officer in supervising a probationer are entitled to immunity." *Id.* Many probation officer duties are administrative or supervisory and, thus, are "not part of the judicial function." *Id.* We held that "[a] probation officer cannot assert for immunity unless the officer is acting pursuant to or in aid of the directions of the court." *Id.* Thus, the probation officer was not immune from the parents' suit because he permitted the probationer to reside with minor children in violation of the court's specific direction prohibiting contact with minors. *Id.* The exception to judicial immunity in *Acevedo* proves the rule.

¶15        In *Adams v. State*, 185 Ariz. 440, 441–43 (App. 1995), the court of appeals, applying the principles established in *Acevedo*, considered whether Department of Economic Security ("DES") adoption caseworkers enjoyed judicial immunity from suit by adopted children.  The children alleged that their DES-approved adoptive parents molested them as a result of the caseworkers' negligent pre-adoption investigation and post-placement supervision.  *Adams*, 185 Ariz. at 442.  The court held that the caseworkers were not immune from suit for their investigative and supervisory actions because "their routine and statutorily-required investigative and supervisory functions were [not] conducted as an integral part of the judicial process."  *Id.* at 446.

¶16        We distill from our jurisprudence the principle that common law judicial immunity applies to court officers, employees, and agents who "assist the court in the judicial process" by carrying out court orders or otherwise serving an integral part of the judicial process.  *Acevedo*, 142 Ariz. at 322; *Adams*, 185 Ariz. at 445–46.  Persons otherwise covered by judicial immunity, however, forfeit immunity if they act contrary to a court's directive.  *Acevedo*, 142 Ariz. at 322.  In executing writs, constables both assist the court in the judicial process and serve an integral part of the judicial process if they act consistent with a court's directive.[3]  Thus, constables act as officers of the court and are entitled to judicial immunity when they execute court orders, including writs of restitution, § 22-131(A), as directed by the court.  *See Clark*, 219 Ariz. at 72 ¶ 21; *cf. State ex rel. Andrews v. Superior Court*, 39 Ariz. 242, 248–49 (1931) (holding that a sheriff acts as an officer of the court when carrying out certain statutory duties of the office).  As a constable, Garibay was entitled to common law judicial immunity when executing a writ of restitution.

---

[3]  Statutory immunity for constables may also exist pursuant to A.R.S. § 41-621(K), which shields state officials from personal liability for "an injury or damage resulting from an act or omission in a public official capacity where the act or omission was the result of the exercise of the discretion vested in the officer, agent or employee and if the exercise of the discretion was done in good faith without wanton disregard of statutory duties."  However, because neither party raised this argument, we do not address that statute.  *See Jimenez v. Sears, Roebuck & Co.*, 183 Ariz. 399, 406 n.9 (1995) ("We do not ordinarily consider issues not raised in the trial court or court of appeals.").

**II.**

¶17        We next consider whether § 11-449 abrogates or limits Garibay's immunity.  Fox argues that the "Arizona Legislature itself abolished any common-law or other judicial immunity in one specific area through § 11-449's plain words."

¶18        Section 11-449, titled "Liability relating to writs, levies or sales," provides:

> If a sheriff neglects to make due return of a writ or paper delivered to him to be served or executed, or is *guilty of any misconduct* in the service or execution thereof, he is liable to the party aggrieved for damages sustained, and, in addition, for a penalty of two hundred dollars.

(Emphasis added.)  Although § 11-449 refers only to "sheriffs," the statute also applies to constables.  *See* § 22-131(D) ("The provisions of law relating to sheriffs, as far as applicable, shall govern the powers, duties and liabilities of constables.").

¶19        Fox is correct that, under Arizona law, statutes may abrogate or limit the common law.  *See* A.R.S. § 1-201 (declaring that the common law applies "only so far as it is consistent with . . . the laws of this state"); *see also Zambrano v. M & RC II LLC*, 254 Ariz. 53, 65 ¶ 43 (2022) (noting that common law rules only apply when legislative guidance is lacking). However, "if the common law is to be changed or abrogated by statute, the legislature must do so expressly or by necessary implication." *Pleak v. Entrada Prop. Owners' Ass'n*, 207 Ariz. 418, 422 ¶ 12 (2004).  "Absent a clear manifestation of legislative intent to abrogate the common law, we interpret statutes with 'every intendment in favor of consistency with the common law.'"  *Id.* (quoting *In re Thelen's Est.*, 9 Ariz. App. 157, 160–61 (1969)); *see also* § 1-201 (adopting the common law to the extent it is "not repugnant to or inconsistent with the Constitution of the United States or the constitution or laws of this state").

¶20        Here, § 11-449 evinces no legislative intent to abrogate judicial immunity or, as Fox contends, to "abolish[] any common-law or other judicial immunity in one specific area."  In fact, the statute does not mention judicial immunity at all.  There is no textual support for Fox's claim that the

legislature intended the statute to abolish "any" judicial immunity in these circumstances.

**¶21** Section 11-449, however, limits the scope of judicial immunity in specific circumstances. As relevant here, the statute imposes liability on constables who are "guilty of any misconduct in the service or execution" of a writ. To the extent constables may have been immune from suit under the common law for misconduct in the service or execution of a writ, the legislature has eliminated such immunity.[4] Thus, Garibay is not immune from Fox's suit if she was "guilty of any misconduct" in the service or execution of the writ of restitution.

### III.

**¶22** Although as a constable Garibay is entitled to judicial immunity, § 11-449 eliminates such immunity if she is "guilty of any misconduct" in the service or execution of the writ of restitution. Thus, this case turns on the meaning of "misconduct" in § 11-449.

### A.

**¶23** We begin with the text when interpreting a statute. *Franklin v. CSAA Gen. Ins. Co.*, 255 Ariz. 409, 411 ¶ 8 (2023). "We interpret statutory language in view of the entire text, considering the context and related statutes on the same subject." *Nicaise v. Sundaram*, 245 Ariz. 566, 568 ¶ 11 (2019). If a statute's text is plain and unambiguous, it controls unless it results in an absurdity or a constitutional violation. *4QTKIDZ, LLC v. HNT Holdings, LLC*, 253 Ariz. 382, 385 ¶ 5 (2022). However, "[i]f the statutory

---

[4] Fox argues that § 11-449's "specific liability" "defeats any general statutory immunity" the legislature codified in A.R.S. § 12-820.01(A), which immunizes a "public entity" from liability for actions and omissions of its employes in the exercise of a judicial function. Invoking the principle that a specific statute prevails over a general one, *Morton v. Mancari*, 417 U.S. 535, 550–51 (1974), Fox submits that §§ 11-449 and 12-820.01(A) can be harmonized to maintain "general judicial immunity for most judicial functions [in the latter], with the exception in this case of special liability [in the former]." Assuming, without deciding, that § 12-820.01(A) applies to constables as "public entities," we agree. Therefore, we need not address § 12-820.01(A).

language is ambiguous—if 'it can reasonably be read in two ways'—we may use alternative methods of statutory construction, including examining the rule's historical background, its spirit and purpose, and the effects and consequences of competing interpretations." *Planned Parenthood Ariz., Inc.*, 257 Ariz. at 142 ¶ 17 (quoting *State v. Salazar-Mercado*, 234 Ariz. 590, 592 ¶ 5 (2014)).

**¶24** Section 11-449 does not define "misconduct." Absent a statutory definition, we may consider dictionaries and written publications to discern the word's common meaning and usage, respectively, at the time the legislature enacted the statute. *Matthews v. Indus. Comm'n*, 254 Ariz. 157, 163 ¶ 33 (2022); *see also In re Drummond*, 257 Ariz. 15, 18 ¶ 7 (2024). The legislature first adopted the language that now appears as § 11-449 in 1901; it was readopted as a statute in 1913. *See* Ariz. Civ. Code, §§ 1089, 1090 (1901); Ariz. Civ. Code, §§ 2542, 2543 (1913). Therefore, we determine the common meaning of "misconduct" as that term was understood when first adopted in 1901. *Matthews*, 254 Ariz. at 165 ¶ 40 ("When a subsequent enactment imports unchanged earlier language, it imports the original meaning as well."); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 323 (2012) ("[W]hen a statute uses the very same terminology as an earlier statute, especially in the very same field, . . . it is reasonable to believe that the terminology bears a consistent meaning. One might even say that the body of law of which a statute forms a part—especially if that body has been codified—is part of the statute's context.").

### 1.

**¶25** We begin by examining contemporaneous dictionary definitions. The Century Dictionary defines "misconduct" as "[w]rong conduct; misbehavior" and "[m]ismanagement." *Misconduct*, The Century Dictionary: An Encyclopedic Lexicon of the English Language (1897). Fox relies on several dictionary definitions that align with this general construction of "misconduct," but his sources fall outside the relevant time period. Although ordinary dictionary definitions are inconclusive, they establish that the ordinary meaning of "misconduct" embodies wrongdoing.

**¶26** Fox also overlooks two legal dictionaries from the relevant time period that refine the meaning of "misconduct" and define "wrong

conduct," "misbehavior," and "mismanagement." First, Judicial and Statutory Definitions of Words and Phrases ("First Judicial") defines "misconduct" as:

> [I]mplies a wrongful intention, and not a mere error of judgment . . . . In usual parlance, misconduct means a transgression of some established and definite rule of action, where no discretion is left, except what necessity may demand; and carelessness, negligence, and unskillfulness are transgressions of some established, but indefinite, rule of action, where some discretion is necessarily left to the actor. Misconduct is a violation of definite law; carelessness, an abuse of discretion under an indefinite law. Misconduct is a forbidden act; carelessness, a forbidden quality of an act, and is necessarily indefinite.

*Misconduct*, Judicial and Statutory Definitions of Words and Phrases (1904). Thus, First Judicial's definition juxtaposes the concept of misconduct with negligence, explaining that misconduct embodies wrongful intent rather than mere error.

¶27         Second, Black's Law Dictionary aligns with First Judicial's definition of "misconduct":

> Any unlawful conduct on the part of a person concerned in the administration of justice which is prejudicial to the rights of parties or to the right determination of the cause . . . . The term is also used to express a dereliction from duty, injurious to another, on the part of one employed in a professional capacity, as an attorney at law, . . . or a public officer.

*Misconduct*, Black's Law Dictionary (2d. ed. 1910). Read together, First Judicial and Black's Law suggest the plain meaning of "misconduct" as an intentional violation of an applicable rule, standard, or norm. Relevant here, they denote "a dereliction from duty . . . on the part of . . . a public officer." *Id.*

**2.**

¶28        We next consider corpus linguistics to aid our understanding of the common usage of "misconduct" when the legislature enacted the statute.  Corpus linguistics is a helpful tool in determining a word's common usage.  *See Matthews*, 254 Ariz. at 163 ¶ 33.  It is performed on "a massive database that enables date-specific searches for the possible, common, and most common uses of words or phrases as they were used in newspapers, books, magazines, and other popular publications."  *Id.*  Corpus linguistics research is helpful to ascertain a term's ordinary meaning "because the human brain understands words not in isolation but in their broader semantic (and pragmatic) context, [and] we may often miss the import of a given . . . term if we just separately look up its component words in the dictionary."  Thomas R. Lee & James C. Phillips, *Data-Driven Originalism*, 167 U. Pa. L. Rev. 261, 283 (2019).

¶29        A search of the Corpus of Historical American English for "misconduct" as used between 1900 and 1919 yields seventy-six results.  Search of "Misconduct" from 1900–1919, Corpus of Hist. Am. Eng., https://www.english-corpora.org/coha/?c=coha&q=122908439        (last visited Mar. 3, 2025).  Of these seventy-six results, sixty-two refer to intentionally wrongful acts serious enough to justify consequences or removal from a position. *Id.*  Notably, only one entry used "misconduct" interchangeably with "negligence," while thirteen sources used "misconduct" indiscernibly.  Thus, the prevailing common usage of "misconduct" during the relevant period connotes intentional rather than negligent conduct.

¶30        Our corpus review is consistent with our linguistic analysis—"misconduct" refers to intentional violations of an applicable rule, standard, or norm.  Dictionary definitions and corpus linguistics entries demonstrate the objective—clear duty or rule violation—and the subjective—intentional—components of "misconduct" as the word was commonly understood and used when the legislature adopted it.

**3.**

¶31        Our jurisprudence interpreting "misconduct" at the time the legislature first codified the term is also consistent with our dictionary and corpus linguistics analyses.  In *Mooney v. Broadway*, 2 Ariz. 107, 113 (1886),

a sheriff prematurely released property levied under a writ. We held that the sheriff committed "misconduct," even though the sheriff did not intentionally neglect his duty. *Mooney*, 2 Ariz. at 113. We reject any implication, however, that *Mooney* can be read to expand "misconduct" to include negligence. The "misconduct" in *Mooney* refers to the sheriff's failure to carry out the writ's terms. *Id.*

¶**32** In *Stiles v. W. Union Telegraphic Co.*, 2 Ariz. 308, 311 (1887), the appellant sued for damages resulting from a delay in delivering a telegraphic message. We held the telegraph company liable for damages for failing to timely deliver the message and characterized the company's conduct as "gross negligence and palpable misconduct." *Stiles*, 2 Ariz. at 312. As in *Mooney*, the telegraph company's misconduct in *Stiles* arose from its intentional violation of a duty. The Court's allusion to "gross negligence" does not alter its fundamental point that the company's misconduct arose from the failure to meet its obligation to its customer.

¶**33** *Mooney* and *Stiles* confirm our definition of "misconduct." In those cases, we characterized the intentional violation of a duty — whether to properly carry out a writ or to timely deliver a telegram — as "misconduct." *See Mooney*, 2 Ariz. at 113; *see also Stiles*, 2 Ariz. at 312. We have also acknowledged that sheriffs are liable for violations of clearly established duties when executing writs. *See Fid. & Deposit Co. of Md. v. McFadden*, 47 Ariz. 116, 120 (1936) ("[I]t was the duty of the sheriff to feed and properly care for the cattle [under the writ because] . . . public policy would not permit him to contract against liability for his personal negligence in caring for and feeding the cattle while in his actual possession."); *Schuster v. Merrill*, 56 Ariz. 114, 119 (1940) (stating that a sheriff violates his statutory duty to serve all process regular on its face where lack of authority for issuance of the process is "apparent on its face").

¶**34** We therefore hold that "misconduct" in § 11-449 means an intentional violation of an applicable rule, standard, or norm. Here, the relevant applicable rules, standards, and norms that pertain to constables involve implementing a court directive, law, or rule. *See Clark*, 219 Ariz. at 71 ¶ 18. Consequently, under the statute, "misconduct" involves a constable's willful or intentional failure to carry out a court directive, law, or rule, rather than negligence in the manner of discharging such duties.

**B.**

¶35 We now must determine whether Fox's complaint alleges Garibay engaged in "misconduct," within the meaning of § 11-449, in executing the writ of restitution resulting in Angela's death.

¶36 Fox's complaint alleges that "[t]he wrongful death of Angela Fox occurred due to the negligence and/or gross negligence of Defendants," which includes Garibay. Specifically, he alleges that Garibay acted with negligence and/or gross negligence by inviting Angela to accompany her to execute the writ because Garibay knew that the tenant "was evicted for threatening a resident with a gun and disturbing the peace." Fox argues "[Garibay] should have never attempted this dangerous eviction alone or with a hapless civilian tagging along." On appeal, Fox argues that Garibay's acts involved "misconduct" because they "constituted improper conduct, mismanagement, wrong conduct, ill behavior, misbehavior, bad behavior, bad conduct."

¶37 We first address Fox's negligence claim. Although Fox initially argued that ordinary negligence always constitutes "misconduct" under § 11-449, he abandoned this claim at oral argument. We commend Fox for this concession. Negligence entails breach of a duty to conform to a standard of care, which causes injury and damages. *See Ryan v. Napier*, 245 Ariz. 54, 59 ¶ 17 (2018) ("A negligence claim focuses on the defendant's conduct; intent is immaterial."). Under this standard, it is not necessary to show "misconduct" to prove negligence.

¶38 We now turn to Fox's gross negligence claim. We have acknowledged that defining "negligence" and "gross negligence" "is, at best, inexact." *Weatherford ex rel. Michael L. v. State*, 206 Ariz. 529, 535 ¶ 20 n.4 (2003). Inexactitude aside, our courts recognize that gross negligence differs from ordinary negligence. *See, e.g.*, *Kemp v. Pinal County*, 13 Ariz. App. 121, 124–25 (1970) (noting that "[a] person can be very negligent and still not be guilty of gross negligence"). A party is grossly negligent if they know, or have reason to know, facts that would lead a reasonable person to recognize their conduct created an unreasonable risk of bodily harm and involved a high probability of substantial harm. *Noriega v. Town of Miami*, 243 Ariz. 320, 328 ¶ 35 (App. 2017); *see also Gross Negligence*, Black's Law Dictionary (12th ed. 2024) ("Gross negligence is traditionally said to be the omission of even such diligence as habitually careless and inattentive

people do actually exercise in avoiding danger to their own person or property."). Thus, gross negligence requires a level of disregard beyond ordinary inattention but less than conscious indifference. *Noriega*, 243 Ariz. at 328 ¶ 36. Gross negligence does not encompass intentional malfeasance.

**¶39**      An illustration brings the distinction between gross negligence and misconduct into sharper relief. Gross negligence is playing with matches near a dry forest with a burn ban in effect: reckless, irresponsible, without regard for others, and with a high probability of substantial harm. Misconduct, on the other hand, is the intentional act of lighting a match with the purpose of causing a wildfire. This distinction matters. Gross negligence embodies extreme carelessness, but it falls short of the deliberate wrongdoing required for "misconduct."

**¶40**      We concur in the court of appeals' holding that mere allegations of negligence and gross negligence do not allege "misconduct" under § 11-449. *Garibay*, 257 Ariz. at 127 ¶ 26. Fox's allegations arise from Garibay's manner of executing a writ, a court directive she was required to follow. There is no allegation that Garibay failed, intentionally or otherwise, to comply with the court's command to execute the writ—the applicable rule, standard, or norm. Because Fox merely alleged that Garibay was negligent or grossly negligent in carrying out the court's order, he has not alleged that she engaged in "misconduct" under § 11-449. Thus, Fox's complaint fails to state a claim for relief because judicial immunity shields Garibay from suit on the allegations asserted in his complaint.

## CONCLUSION

**¶41**      The legislature, in § 11-449, limited constables' judicial immunity, as relevant here, if a constable "is guilty of any misconduct" in the service or execution of a writ. The statute's effect on a constable's judicial immunity does not create liability for gross negligence in the service or execution of a writ. If the legislature intended to curtail constables' immunity in that manner, it would have done so. *See* A.R.S. § 12-820.02(A)(1) (adopting qualified immunity to protect officials from liability for ordinary negligence but not for gross negligence or intentional misconduct); *Clouse ex rel. Clouse v. State*, 199 Ariz. 196, 207 ¶ 42 (2001); *see also Spooner v. City of Phoenix*, 246 Ariz. 119, 124 ¶ 10 (App. 2018).

**¶42** We therefore vacate ¶¶ 11–26 of the court of appeals' decision,[5] reverse the trial court's ruling, and remand to the trial court for further proceedings consistent with this Opinion.

---

[5] Because we did not grant review on the issue of legislative immunity, we express no opinion on ¶¶ 6–10 of the court of appeals' opinion.

TIMMER, C.J., concurring in the result.

**¶43**   I join the majority opinion and agree with its holding.  I write separately to pump the brakes on embracing corpus linguistics as a reliable aid in statutory and constitutional interpretation.  *See supra* ¶¶ 28–30.

**¶44**   In *Matthews v. Indus. Comm'n*, 254 Ariz. 157, 163 ¶ 33 (2022), this Court relied on corpus linguistics without the benefit of adversarial testing from the parties.  *See* Peter Henderson et al., *Corpus Enigmas and Contradictory Linguistics: Tensions Between Empirical Semantic Meaning and Judicial Interpretation*, 25 Minn. J.L. Sci. & Tech. 127, 151 n.87 (2024) (hereafter, "Henderson") (including *Matthews* among the cases that have initiated and conducted a corpus linguistics analysis without party input).  In my partial concurrence and dissent, I rejected use of corpus linguistics without further vetting.  *See Matthews*, 254 Ariz. at 168 ¶ 58 (Timmer, V.C.J., concurring in part and dissenting in part) (lamenting the lack of sufficient information corpus linguistics and pointing out that the database used in that case "does not reflect oral usage" of words).  This case presents the second time we have used corpus linguistics, and for the second time we are doing so without input and adversarial testing from the parties.  In my view, this is short-sighted and may present problems in future cases.

**¶45**   To be clear, I am not opposed to corpus linguistics.  Like any appellate judge, my eyes light up at the prospect of using an empirical, scientific tool to help identify textual meaning.  But caution is warranted. Some scholars enthusiastically embrace corpus linguistics for use in interpreting legal texts, albeit with caveats.  *See* Thomas R. Lee & Stephen C. Mouritsen, *Judging Ordinary Meaning*, 127 Yale L.J. 788, 851–58 (2018). Others warn that using corpus linguistics "may sub silentio clash with express jurisprudential commitments."  Henderson, *supra* ¶ 44, at 127; *see also Marshall v. PricewaterhouseCoopers, LLP*, 539 P.3d 766, 780 n.1 (Or. 2023) (James, J., dissenting) (opining that corpus linguistics is "problematic on many levels, including suffering from the limitations and biases of those who compile the corpus, manipulation through the choice of database, and potentially overly suggestive results due to the construction of the search terms and methods").  That gets my attention.  Thus, in my view, we should not rely on corpus linguistics before receiving input and scrutiny from parties; ensuring ourselves that the database searched is a reliable tool for identifying ordinary meaning of words; and adopting a research and

interpretive methodology that ensures we use the tool with an appropriate degree of precision.

¶46        This special concurrence is not the place to thoroughly analyze if and how corpus linguistics should be used to interpret legal texts. I am not an expert in linguistics, and I am unwilling to engage in scientific research without input from parties affected by the results. *See State v. Rasabout*, 356 P.3d 1258, 1264–66 ¶¶ 16–21 (Utah 2015) (criticizing sua sponte corpus linguistics research as unfair to parties and outside judicial expertise). Instead, I urge parties in future cases to examine the utility of corpus linguistics and advise this Court about if and how corpus linguistics should be used. This analysis may become particularly imperative as corpus linguistics interacts with artificial intelligence. *See* Henderson, *supra* ¶ 44, at 132 (warning that problems with corpus linguistics are likely to increase with the corresponding use of large language models "as meaning can include the arbitrary references of annotators or model creators").

¶47        From my cursory review of writings on legal corpus linguistics—and there are an untold number—several issues deserve consideration. There are likely more. I have plugged the questions that immediately come to mind into two broad categories.

¶48        First, parties should identify whether a database or mix of databases can be reliably used to identify the ordinary meaning of words used in legal texts. In doing so, parties should consider criticisms that databases "rely on foreign law to give meaning to U.S. constitutional or statutory provisions," which courts generally eschew; "offer subjective or strategic forms of legislative history" that do not reflect the ordinary meaning of the words used in text; and "represent[] elite rhetoric, not ordinary original public meaning." *See id.* at 131–32, 153 (emphasis removed).

¶49        Second, parties should identify the appropriate methodology for searching a database and interpreting the results. For example, what role does context play in the analysis? *See* Anya Bernstein, *Legal Corpus Linguistics and the Half-Empirical Attitude*, 106 Cornell L. Rev. 1397, 1429 (2021) ("Legal corpus linguistics, with its obsessive focus on single words used in unconnected situations, to the exclusion of larger and more relevant contexts, encourages legal interpreters to neglect the real import of their decisions."). Should inquiries solely focus on use of words in a legal

context? *See id.* at 1417 ("One key thing legal corpus linguistic inquiry tends to neglect is the *legal* context of legal language." (emphasis in original)). Are there any fallacies to avoid in using corpus linguistics? *See* Kevin P. Tobia, *Testing Ordinary Meaning*, 134 Harv. L. Rev. 726, 735 (2020) (explaining the "nonappearance fallacy," which falsely "claim[s] that absence of a usage from a large corpus indicates that the usage is not part of the ordinary meaning"); *see also* Tammy Gales & Lawrence M. Solan, *Revisiting a Classic Problem in Statutory Interpretation: Is a Minister a Laborer?*, 36 Ga. St. U. L. Rev. 491, 500 (2020) (pointing out that the blue pitta, a bird of Asia, does not appear in the Corpus of Contemporary American English, but that does not make it any less a bird).

**¶50** Corpus linguistics' promise of scientific objectivity is undeniably seductive. But it is the proverbial black box: I can see what goes in and what comes out, but I cannot see inside. And until "what's inside" is sufficiently probed by parties with a stake in the outcome, perhaps with the assistance of expert linguists, I believe the Court should rely exclusively on time-tested methods of statutory and constitutional interpretation. Here, dictionaries that were curated by lexicographers and caselaw support the plain meaning of "misconduct" identified by the majority. I think the analysis should stop there. For now, I continue to believe that we should not treat corpus linguistics as a settled part of our interpretive toolkit but instead view it as an intriguing *possible* tool and invite adversarial testing of that tool. With these thoughts in mind, and with respect to my colleagues, I concur in the opinion.